K.W., Appellant–Respondent,

v.

**LOGANSPORT STATE HOSPITAL,**
**Appellee–Petitioner.**

No. 49A02–9409–CV–575.

Court of Appeals of Indiana.

Jan. 25, 1996.

William F. Thoms, Jr., Indianapolis, for appellant.

Pamela Carter, Attorney General, Victoria M. Ransberger, Deputy Attorney General, Office of the Attorney General, Indianapolis, for appellee.

## OPINION

SULLIVAN, Judge.

K.W. appeals the trial court's decision continuing his regular commitment to Logansport State Hospital.

K.W. contends that the court erred in continuing the commitment and that he was denied the effective assistance of counsel at the recommitment hearing.

We affirm.

The facts most favorable to the trial court's judgment reveal that on December 15, 1983, Dr. Dennis Anderson petitioned the trial court to have K.W. committed to a mental institution. On December 27, 1983, the court ordered K.W. placed under regular civil commitment at Central State Hospital after finding that he was suffering from mild mental retardation, conduct disorder, and undersocialized aggressive behavior. The court conducted a hearing on December 13, 1984, after which it signed an order continuing the commitment at Central State. In both 1985 and 1986, without hearings, the court ordered continuing regular commitment based upon the annual reports Central State filed with the court. In early 1987, K.W. was placed with his family to participate in an outpatient program at Four County Mental Health Center. However, he was admitted to Logansport State Hospital in July of 1987 after being accused of sexually molesting his niece. Between 1987 and 1991, the court annually signed orders continuing K.W.'s commitment without a hearing. In doing so, the court relied upon the periodic reports and treatment summaries filed by the Hospital. The reports indicate that K.W. was harmful to himself and to others, and that he was unable to provide for his needs. Some reports outline instances of paraphilia and transvestism.[1] The court held a review hearing in 1992, after which it determined that K.W. was suffering from schizophrenia and continued his commitment. On December 28, 1992, K.W. wrote the trial judge a letter in which he requested a hearing to review his commitment. On March 4, 1993 the trial court ordered continued commitment without a hearing,[2] after which it scheduled a review hearing for June 25, 1993 in light of the 1992 letter. Nothing in the record indicates that any such hearing occurred in 1993. However, the record does reveal that K.W. was placed in a sex offender's program sometime in August of 1993.

---

[1]. The report filed in 1987 revealed that K.W. tried to leave the Hospital, that he became physically violent on occasion and that he had to be hospitalized for removal of objects he placed in his rectum. Reports filed in 1988, 1989, and 1990 note that K.W. was uncertain about his sexuality and identity, and that he was physically aggressive if confronted. The 1991 report indicates a cessation of hallucinations, lessened irritability and anger, and a lifting of depression. The report, however, recorded that K.W. desired to wear undergarments in order to infantilize himself, that he continued to place objects in his rectum, and that he had attempted to leave Logansport State Hospital three times in eight months.

[2]. The annual report filed in February of 1993 revealed some significant progress, but noted that K.W. struggled with a strong impulse disorder and intense mood swings. The report also revealed that he was still harmful to himself, citing his history of two self-mutilations requiring major abdominal treatment procedures. In June of 1992, K.W. placed a narrow rod through his erect penis into his bladder causing a hemorrhage which required treatment by a urologist. The report also relates instances in which K.W. brandished a wooden chair leg and struck an attendant in the face with his elbow.

On June 1, 1994, the court next considered K.W.'s commitment. On that date, the court held a recommitment hearing at which Dr. Mariatte Gardose testified concerning K.W.'s treatment and condition. Dr. Gardose had been assigned as K.W.'s treating psychiatrist at Logansport six days prior to the hearing.[3] Dr. Gardose diagnosed K.W. as having a past history of chronic, undifferentiated schizophrenia and mild mental retardation. She reached the diagnosis based upon her review of K.W.'s mental health records.[4] Dr. Gardose signed the annual report and treatment summary for K.W., which was filed the day of the hearing. The report notes that K.W. made threatening statements toward hospital staff and that he displayed inappropriate behavior and social skills, including begging, manipulating and lying. Dr. Gardose agreed that K.W. presented a danger to himself and to others and that he was unable to care for himself outside the hospital. She added that there was no primary aftercare plan for K.W. because of his impulsive, unpredictable behavior. She also requested a court order that would require K.W. to take his prescribed medications.

The Hospital's next witness, Michael Gray, a behavior clinician at Logansport State Hospital, also testified with regard to K.W.'s treatment and condition. Gray explained that K.W. was not responding favorably to the sex offender program because he would not participate in the therapy and frequently denied the need for such treatment. He also opined that K.W. was a threat to himself and to others, citing many of the same incidents as did Dr. Gardose.

K.W.'s case-in-chief consisted solely of his own testimony. He maintained that he did not molest any of his nieces and that he thought he was being specially punished for so maintaining his innocence. He also thought that he could take care of himself and that he could stop the self-mutilating behavior if he was released.

At the close of the evidence, the court concluded that K.W. suffered from chronic undifferentiated schizophrenia as well as mental retardation. The court also concluded that K.W. was a danger to himself and to others. In doing so, the trial judge specifically stated that he afforded no weight to the molestation charges. The court ordered continued commitment at Logansport State Hospital and denied the request for forced medication. K.W. initiated this appeal.

## I. APPROPRIATE TREATMENT ISSUE

K.W. argues that we should remand this case to the trial court because the trial court failed to review K.W.'s treatment plan to determine whether he was receiving appropriate treatment and because the Hospital failed to show by clear and convincing evidence that he was receiving such treatment. Specifically, K.W. complains that his placement in the sex offender program at Logansport is inappropriate because he maintains that he is not a child molester and that the bare allegations that he molested his niece are insufficient to justify his continued placement in such a program. The Hospital counters that K.W. did not raise the appropriate or effective treatment argument during the recommitment hearing, and that he may not now raise it for the first time upon appeal. We agree with the Hospital.

■ As an initial matter, we note that the Hospital is not *required* to show at a recommitment hearing that the committed individual is receiving appropriate or effective treatment. Indiana Code 12–26–15 (Burns Code. Ed.Repl.1995) addresses judicial review of civil recommitment proceedings. Indiana Code 12–26–15–1 provides that at least annually, the superintendent of the commitment

---

3. The record reveals that K.W. was treated by a succession of psychiatrists between 1987 and 1994. Dr. Indu J. Dave was his treating psychiatrist in 1987, followed by Dr. Borijov S. Divcic, who signed K.W.'s annual reports from 1988 to 1990. Thereafter, Dr. Gregory Allen treated K.W. until Dr. Allen left Logansport State Hospital early in 1994.

4. Dr. Gardose referred to previous documentation indicating that early in 1994 K.W. was placed on suicide precaution because he commented to the nursing staff that he was going to hurt himself with a pencil. She also testified that the manner in which he demanded to be provided with a bladder-control undergarment was "threatening." Record at 101.

facility or the individual's attending physician must file with the court a review of the patient's care and treatment. The review must contain a statement of the individual's mental condition, whether the individual is dangerous or gravely disabled, and whether the individual needs to remain in the facility or whether he or she may be cared for under a guardianship. Upon receipt of the report, the court must do one of three things: (1) order the individual's continued custody, care and treatment in the appropriate facility or therapy program; (2) terminate the commitment or release the individual from the therapy program; or (3) conduct a discharge hearing under I.C. 12–26–12. Indiana Code 12–26–15–3 provides that upon receiving a copy of the court order continuing the commitment or therapy program, the individual or the individual's representative may request a hearing for review or dismissal of the commitment or order concerning the therapy program.[5] By conducting the hearing which forms the basis of this appeal, the trial court here complied with these requirements.

K.W. reminds us of the protections afforded a committed patient in I.C. 12–27–2–1 (Burns Code Ed.Repl.1995) and I.C. 12–27–5–2 (Burns Code Ed.Repl.1995). It is true that I.C. 12–27–2–1 and I.C. 12–27–5–2 provide avenues by which committed patients may place the appropriateness of a particular course of treatment or habilitation program before a court for judicial review. Indiana Code 12–27–2–1 provides in relevant part that a patient is entitled to each of the following:

"(1) Mental health services or developmental training:

(A) In accordance with standards of professional practice;

(B) Appropriate to the patient's needs; and

(C) Designed to afford a reasonable opportunity to improve the patient's condition."

If these rights are violated, a patient may bring an action under I.C. 12–27–8–2 in a court of competent jurisdiction or seek relief through administrative action under I.C. 12–27–8–3. In addition, I.C. 12–27–5–2 allows an involuntarily committed patient who wants to refuse to submit to treatment or a habilitation program to petition the committing court or hearing officer for consideration of the treatment or program.

Although not *required* by the statutes governing recommitment proceedings, we find nothing which indicates that a recommitment hearing is an *inappropriate* forum for judicial consideration of a patient's particular treatment program, assuming that the patient has clearly presented the issue to the court.[6] Indiana Code 12–26–15–3 provides that in requesting a recommitment hearing, an individual may seek "review or dismissal of the ... order concerning the therapy program."[7] We agree that, upon proper petition or notification, the appropriateness of an individual's treatment may be litigated within the context of a recommitment hearing. However, we disagree with K.W.'s counsel's conclusion that K.W.'s 1992 letter was either a refusal of treatment pursuant to I.C. 12–27–5–2 or a challenge to the appropriateness of his treatment under I.C. 12–27–2–1 and I.C. 12–27–8–2. We also disagree with K.W.'s contention that these issues were adequately presented during the hearing such that it was error for the trial court not to have considered these issues.

K.W.'s 1992 letter cannot be characterized in any way as having raised the appropriateness or refusal issues. In his 1992 letter, K.W. wrote that he had exhibited good behavior and that he had been ready for discharge for some time. However, he maintained that the staff at the Hospital did not

---

5. In the instant case, the trial court held the review hearing and made its recommitment determination on the same day, June 1, 1994.

6. *Cf. Petition of Ackerman* (1980) Ind.App., 409 N.E.2d 1211 (issue of appropriate treatment raised for the first time at recommitment hearing).

7. A review of a therapy program as contemplated by the statute concerns an outpatient program, not a program administered with reference to a patient confined within a mental health facility. *See* I.C. 12–26–14–8 (Burns Code Ed.Repl.1995).

show a willingness to work with him regarding release. He then asked for a hearing date at which he and the judge might be able to "agree on a specific plan to get [him] out of LSH." Record at 69. Specifically, he suggested psychological testing in the hope that the court would determine that he was fit for release. The remainder of the letter focused upon his belief that he was fit for release and those family members he would like to be present at a discharge hearing. It is clear that the focus of K.W.'s letter is a request for a hearing to determine whether he was fit for release; it is hardly an unequivocal statement that he refused to be placed in the sex offender program or that the sex offender program was inappropriate treatment for him. Moreover, to the extent that K.W. relies upon the letter as supporting his contentions that being in the sex offender program is inappropriate treatment or that he refused such treatment, it is inapposite because uncontradicted evidence of record reveals that K.W. was not in the sex offender unit in November of 1992 when he wrote the letter requesting a hearing.[8]

■ The transcript of the hearing provides K.W. with scant support as well. Upon appeal, K.W. asserts that he preserved the issues of both his right to appropriate treatment and his right to refuse treatment because at the hearing, he "in effect objected to his placement in a sex offender unit as part of the treatment plan." Appellant's Brief at 23. The record reveals, however, that during the hearing K.W. did not specifically object to his placement in the sex offender program. He merely denied molesting his niece, expressed his frustration with his ongoing commitment, and asserted that if he were released, he could take care of himself and control his self-destructive behavior. These assertions were not sufficient to present the

appropriateness and refusal issues such that it was error for the trial court not to have considered them.

Had K.W. properly brought the issue before the trial court, the court was not without authority to consider the appropriateness or refusal issues within the context of a recommitment hearing. However, because K.W. did not adequately present these issues to the trial court, either through his 1992 letter or his presentation at the hearing, we find no error in the court's failure to consider them.

We stress that our decision in no way precludes K.W. from having the appropriateness of his treatment reviewed by a trial court. While we have concluded that such issues *may* be litigated within the context of a recommitment hearing upon adequate presentation, this decision should not be read to *require* a patient to present appropriateness or refusal issues at such a hearing at the peril of having them waived.[9] The statutory scheme in I.C. 12–27–2–1 and 12–27–5–2 clearly contemplates these provisions as providing alternative means through which a patient can access the courts for review of his treatment, and our decision is designed to provide more flexible, rather than more restrictive, means to do so.

## II. ASSISTANCE OF COUNSEL

■ K.W. asserts that the counsel he received for purposes of the recommitment hearing was ineffective because his counsel did not visit him at the Hospital and because counsel spent at most only fifteen to thirty minutes conferring with him before the hearing. He also asserts that counsel did not file any motions seeking investigators or funds to carry out an investigation into the details of K.W.'s case. He contends that his counsel could not effectively mount an argument con-

---

8. Michael Gray testified at the hearing that K.W.'s treatment in the sex offender program commenced in August of 1993. Nothing in the record indicates that such date is inaccurate.

9. We specifically offer no opinion concerning what standard should be used to evaluate a patient's claims regarding the appropriateness of treatment under I.C. 12–27–2–1 or his refusal of treatment under I.C. 12–27–5–2 in a context such as that presented here. Our Supreme Court's

decision in *In re M.P.* (1987) Ind., 510 N.E.2d 645, established a burden which the State must meet to override a patient's refusal to submit to anti-psychotic medication. 510 N.E.2d at 647–48. The applicability or inapplicability of the *M.P.* standard to a situation in which a patient "refuses" to submit to a non-medicinal treatment plan, which is how K.W.'s counsel characterizes the present case, Appellant's Brief at 23–24, is a question for another day.

cerning appropriate or effective treatment because he could conduct nothing more than a cursory investigation and because he did not have enough time to properly seek or evaluate expert testimony concerning appropriate treatment.

■ The standard for judging the adequacy of counsel's representation in a mental health commitment proceeding is the same as that applied in criminal cases. *See Jones v. State* (1985) 2d. Dist.Ind.App., 477 N.E.2d 353, 357, *trans denied.* Thus, in order to prevail upon his claim of ineffective assistance of counsel, K.W. must first prove by a preponderance of the evidence that counsel made errors so serious that he or she was not functioning as the counsel which the Sixth Amendment guarantees. K.W. must also show that the deficient performance prejudiced him. *See Strickland v. Washington* (1984) 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Wickliffe v. State* (1988) Ind., 523 N.E.2d 1385; *Lawrence v. State* (1984) Ind., 464 N.E.2d 1291; *Jones, supra* 477 N.E.2d at 357. The purpose of the effective assistance guarantee of the Sixth Amendment is to ensure that criminal defendants receive a fair trial. *Strickland, supra*, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694; *Kirby v. State* (1990) 4th Dist.Ind.App., 550 N.E.2d 1343, 1346, *reh'g denied.* There is a strong presumption that counsel's assistance fell within prevailing professional norms, and an appellant must present strong and convincing evidence to rebut that presumption. *Duncan v. State* (1987) Ind., 514 N.E.2d 1252, 1253; *Pearson v. State* (1989) 1st Dist.Ind.App., 543 N.E.2d 1141, 1143.

■ As noted, we will not conclude that counsel's assistance was ineffective in preparing for a civil commitment hearing absent a showing of prejudice. The defendant must show that there was a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Kirby, supra* at 1346. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland, supra*, 466 U.S. at 694, 104 S.Ct.

at 2068, 80 L.Ed.2d at 698; *Kirby, supra* at 1346.

In the instant case, K.W. has not shown that his defense was prejudiced by his counsel's alleged deficient performance, and, accordingly, cannot satisfy the second part of the *Strickland* inquiry. Allegations that his counsel conducted a perfunctory consultation or that he failed to investigate issues that arguably may have resulted in a different trial strategy do not amount to ineffective assistance absent a showing of what additional information may have been garnered either from further consultation or investigation and how that additional information would have aided in the preparation of his case. *See, e.g., Jones, supra* 477 N.E.2d at 358. There has been no such showing here. K.W. has not pointed to any additional information that he could have provided his attorney had he been afforded more time to meet with him. In the same vein, K.W. has not alleged with any specificity what additional information he may have been able to discover had his counsel conducted any further investigation into the molestation allegations.[10] Moreover, he has not shown with any degree of specificity how any such additional information would have aided in the preparation of his case concerning the appropriate treatment issue.

The judgment of the trial court is affirmed.

KIRSCH and RILEY, JJ., concur.

---

**10.** In this regard and as earlier noted, the recommitment court specifically stated that no weight was accorded the molestation allegations.